# EXHIBIT B

# Deposition Transcript

Case Number: 2:22-CV-07534 FLA-MAA
Date: March 29, 2024

In the matter of:

# LOPEZ, et al. v CITY OF LOS ANGELES, et al.

# BENNET OMALU



**CERTIFIED COPY**

**Reported by:**

April D. Biedermann
WA CCR No. 21028823, RSR

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                       ---oOo---

 4   MARGARITO T. LOPEZ, SONIA   )
     TORRES, KENI LOPEZ, ROSY    )
 5   LOPEZ,                      )
                                 )
 6              Plaintiffs,      )
                                 )
 7   vs.                         ) Case No. 2:22-CV-07534 FLA-MAA
                                 )
 8   CITY OF LOS ANGELES, JOSE   )
     ZAVALA, JULIO QUINTANILLA,  )
 9   AND DOES 1 THROUGH 10,      )
     INCLUSIVE,                  )
10                               )
                Defendants.      )
11   _____

12        REMOTE DEPOSITION UPON ORAL EXAMINATION OF

13                      BENNET OMALU

14

15              Friday, March 29, 2024

16                3:04 PM Pacific Time

17

18

19

20

21

22

23   Reported by:
     April D. Biedermann, RSR, WA CCR No. 21028823
24   Steno Agency
     concierge@steno.com
25   (888) 707-8366
```

BENNET OMALU                                                          JOB NO. 915073
MARCH 29, 2024

```
 1                    APPEARANCES VIA ZOOM:

 2   FOR THE PLAINTIFF:

 3                RENEE V. MASONGSONG
                  SHANNON LEAP
 4                Law Offices of Dale K. Galipo
                  21800 Burbank Boulevard
 5                Suite 310
                  Woodland Hills, California 91367-6479
 6                (818) 347-3333
                  rvalentine@galipolaw.com
 7                sleap@galipolaw.com

 8                LUIS A. CARRILLO
                  MICHAEL S. CARRILLO
 9                J. MIGUEL FLORES
                  Carrillo Law Firm LLP
10                1499 Huntington Drive
                  Suite 402
11                South Pasadena, California 91030
                  (626) 799-9375
12                lac4justice@gmail.com
                  mc@carrillofirm.com
13                mf@carrillofirm.com

14
     FOR THE DEFENDANT:
15
                  SHERRY H. LAWRENCE
16                Stone Busailah, LLP
                  1055 East Colorado Boulevard
17                Suite 320
                  Pasadena, California 91106
18                (626) 683-5600
                  s.lawrence@police-defense.com
19

20   ALSO PRESENT:

21                ALEJANDRO MONGUIA

22
                          ---oOo---
23

24

25
```

```
 1                              INDEX

 2                             ---oOo---
                                                                    PAGE
 3    DIRECT EXAMINATION:  MS. LAWRENCE                                4

 4                             ---oOo---

 5                          EXHIBIT INDEX

 6    NO.              DESCRIPTION                                  PAGE

 7    EXHIBIT 1        AMENDED NOTICE OF TAKING DEPOSITION             4
                       OF PLAINTIFF'S DESIGNATED EXPERT
 8                     BENNET OMALU UPON ORAL EXAMINATION
                       AND REQUEST FOR PRODUCTION OF
 9                     DOCUMENTS; 5 pages

10    EXHIBIT 2        Rule 26 report and Curriculum Vitae             4
                       of Bennet Omalu, M.D.; 108 pages
11
      EXHIBIT 3        Article entitled "From scientist to            84
12                     salesman, How Bennet Omalu, doctor
                       of 'Concussion' fame, built a
13                     career on distorted science"; 36
                       pages
14

15

16

17

18

19

20

21

22

23

24

25
```

1        FRIDAY, MARCH 29, 2024, 3:04 PM PACIFIC TIME
2                          ---oOo---
3                        BENNET OMALU,
4         being first duly sworn remotely to tell the truth,
5    the whole truth, and nothing but the truth, was examined and
6    testified as follows:
7
8                       DIRECT EXAMINATION
9    BY MS. LAWRENCE:
10   Q.   Good afternoon, Dr. Omalu.
11   A.   Good afternoon.
12   Q.   As you already heard, I represent the two officers
13        involved in this litigation, Officer Jose Zavala and
14        Julio Quintanilla.  So I just have some questions.
15             The first thing I'd like to do is to attach your
16        Notice of Deposition as Exhibit 1 to the transcript.
17                    (Exhibit No. 1 marked for
18                     identification.)
19   BY MS. LAWRENCE:
20   Q.   And then your Rule 26 report with your CV as Exhibit 2.
21                    (Exhibit No. 2 marked for
22                     identification.)
23   BY MS. LAWRENCE:
24   Q.   And is there anything about your CV, Dr. Omalu, that is
25        not current, or any changes or additions you'd like to

```
 1      scope of the deponent's expertise.
 2               You can answer.
 3               THE WITNESS:  Well, your question is in case
 4      medical care was needed.
 5               Medical care was already needed; not "in
 6      case" medical care was needed.  So they recognized
 7      medical care was needed.  There was no reason shooting
 8      a mental health patient, because he was not committing
 9      any crime.
10               And so to stage EMS means they anticipated
11      they were going to shoot him and kill him.  But this
12      was a mental health crisis.
13               This was a mental health patient that was
14      converted into a criminal, law enforcement crisis
15      unnecessarily, and the patient was killed rather than
16      providing health care to the patient.
17 BY MS. LAWRENCE:
18 Q.   Okay.  Do you believe that a person suffering a mental
19      health crisis can create a danger to others?
20 A.   That is too general a question for me.  It's too
21      general a question that lacks foundation.
22          In this case, coming specifically in this case,
23      for what I have seen, as a doctor, and as a newer
24      scientist, the police escalated the situation where
25      they were so much in a hurry.  They were -- instead of
```

```
 1      deescalating, tampering done the temperature, they came
 2      flashing bright lights on a mental health patient.
 3      Then just -- their flood lights were focused on him;
 4      they were yelling at him; they shot two weapons.
 5           For a mental health patient who was in a crisis,
 6      everything you're doing is to agitate him; you're
 7      making it worse.  And then he stands up with a knife on
 8      himself.  He stands up, you shoot him.
 9           And so there was nothing I saw in that video as a
10      physician, you're asking me, that justified the actions
11      of the officers.  Whatever they did, they failed
12      woefully.
13           This was a patient who needed the protection of
14      the police.  He wasn't -- he was a mental health
15      patient and not a criminal.  But they converted a
16      mental health medical issue to -- they criminalized him
17      and shot him.
18 Q.   Do you consider it a crime to threaten somebody with a
19      knife?
20 A.   Sorry?
21 Q.   Do you consider it a crime to threaten somebody with a
22      knife?
23              MS. MASONGSONG:  Outside the scope.
24              THE WITNESS:  Now, you're asking --
25              MS. LAWRENCE:  Given his testimony, I don't
```

1        think so.
2   BY MS. LAWRENCE:
3   Q.   But go ahead.
4   A.   You're asking me a question about law, whether
5        something is a crime or not. That is a bit above my
6        pay grade.
7             But what I have seen in the video -- luckily we
8        have videos in this case -- I could not see any medical
9        justification as a physician.
10  Q.   Did you --
11  A.   And as a physician who took the Hippocratic Oath to
12       first do no harm, to uphold the dignity of humanity, of
13       life. And the video I saw -- in fact, when I heard the
14       gunshots, I stopped; I shuddered; I rewound the video.
15       What just happened here? How was this individual shot?
16       Okay?
17            And that is my opinion from the video I saw. No
18       matter how we twist it, bend it, this individual should
19       not have -- his life should not have been taken away
20       from him. It is not a crime to be a mental health
21       patient. It is not.
22  Q.   Okay. Let me ask you: Were you given any information
23       that Mr. Lopez had threatened anybody with a knife
24       prior to the arrival of law enforcement that day?
25  A.   I mean, what I know is that the family called for help,

1   okay?

2           If everybody who threatened somebody with a knife
3   were shot dead by the police, then the population of
4   America would drastically go down.  Life expectancy in
5   America would go down sharply.

6           If everybody who is in a mental crisis, they
7   threaten somebody or punch you, I will shoot you, I
8   will stab you, and the police shoot him for that, then
9   we'll be in a state of anarchy.

10          So we deal with the case, specific causation,
11  general causation, you could claim and say anything,
12  but in case specific causation, you deal with the
13  specific facts of the case.

14  Q.  Okay.  So my question is:  Did anyone give you any
15      information about Mr. Lopez threatening anybody with a
16      knife prior to the arrival of law enforcement?
17  A.  I know there was some mental crisis going on.  He may
18      have, he may not have.  I don't remember -- recall
19      completely as I sit here.

20          But by the time the police came, they said the
21      patient was founding, because a standard we use in
22      medicine is take the patient as the patient is.  By the
23      time the police arrived, he was sitting down, was not
24      threatening anybody, was sitting down.  He had a knife
25      with him.  He was not threatening anybody.  He had a

1    knife with him.  And I know when they finally called to
2    let the police know that he was having a mental
3    crisis --
4  Q.  Did you listen to the --
5  A.  Sorry?
6  Q.  Did you listen to the 9-1-1 call to LAPD in this case?
7  A.  I believe I did.  But as I sit here, you know, this
8    listening had no significance in my analysis, in my
9    forensic analysis of this case.
10         Even if he -- even if he had threatened somebody
11   with a knife, even if he did, and he comes, I don't
12   know, legally speaking, since you're going there,
13   they -- they -- the punishment for threatening somebody
14   with a knife is not assassination.  It's not death.
15   You don't threaten somebody with a knife -- the legal
16   punishment for that is not summary execution or
17   assassination.
18         So it doesn't matter if he threatened somebody
19   with a knife.  Does he deserve to die?
20 Q.  Do you have any training in law enforcement?
21 A.  Sorry?
22 Q.  Do you have any training in law enforcement?
23 A.  Exactly, I don't.  That is why I'm surprised why you're
24   asking me all of these questions.
25 Q.  Well, you're also offering a lot of opinions, and

1     that's why --
2  A.  What?
3  Q.  You're offering a lot of law enforcement and
4     criminology opinions, which is why I'm following up on
5     them.
6  A.  No, no, that's not true.  If you notice, I say
7     everything as a doctor, because as a forensic
8     pathologist, we interact with law enforcement so much.
9     Like, this week alone, a couple of my autopsies, the
10    police attended.  We interact with law enforcement a
11    lot, and they ask us questions a lot on the medical
12    aspects of law enforcement.  That is what forensic
13    pathology is, the medical aspects of legal -- of law
14    enforcement; of homicides; of crimes, okay?
15         From the medical aspects, as a forensic
16    pathologist who advises law enforcement on a regular
17    basis, the shooting death of Mr. Lopez cannot be
18    justified.  It cannot.
19         From -- as an expert who is called upon routinely
20    by law enforcement to offer opinions, I don't see any
21    way his death can be justified, medically speaking.
22 Q.  Do you have any training in mental health crises?
23 A.  Oh, yes.  Remember as a doctor, I was trained in
24    psychiatry, I was trained in urology, and mostly a
25    neuropathologist.  Neuropathology deals with:  Why does

1 suffering, somebody experiences, because when you use
2 the word "feel" -- when you feel pain, that is
3 referring to the cognitive aspect of pain. You don't
4 need the cognitive aspect of pain to experience pain
5 and suffering, okay?
6     And so conscious pain and suffering is the pain
7 reflex in people whose Glasgow Coma Scale is above 6 to
8 8 in the scientific description. And when we say 6 to
9 8, it recognizes that there is no sharp demarcation
10 between consciousness and unconsciousness. No, it
11 doesn't exist. So anybody who is exposed to all forms
12 of noxious stimuli that instigates or initiates the
13 pain reflex, and the person's Glasgow Coma Scale is
14 above 6 to 8, will experience pain and suffering.
15 Q. All right. What is pre-mortem pain?
16 A. What is what?
17 Q. Pre-mortem pain?
18 A. Pre-mortem pain. I wouldn't use the term "pre-mortem."
19 Pre-death. In the State of California and other
20 jurisdictions, they don't -- the law does not recognize
21 conscious or unconscious. It just says "pre-death
22 pain." Meaning when you suffer an injury, how long do
23 you survive before you're pronounced dead? So when you
24 determine that period, that is how long you experience
25 pre-death pain.

```
 1
 2
 3                         -oOo-
 4        I, Bennet Omalu, have read the foregoing
 5   deposition transcript and by signing hereafter, subject to
 6   any changes I have made, approve same.
 7
 8         Dated _____.
 9
10                              _____
11                                   BENNET OMALU
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF REPORTER

I, APRIL D. BIEDERMANN, Washington State Certified Court Reporter and NCRA Registered Skilled Reporter, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

__XX__    That the witness requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____    Signature is waived.

_____    The changes made by the witness are appended to the transcript.

_____    No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 5th day of April, 2024.

_____  
April D. Biedermann, CCR, RSR  
WA CCR No. 21028823