# EXHIBIT C

## On-Scene Consulting

February 16, 2024

Mr. Dale K. Galipo, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**MARGARITO T. LOPEZ, SONIA TORRES, KENI LOPEZ, ROSY LOPEZ,
Plaintiffs,
vs.
CITY OF LOS ANGELES, JOSE ZAVALA, JULIO QUINTANILLA, AND DOES
1 THROUGH 10, INCLUSIVE,
Case No. 2:22-CV-07534-FLA-MAA.**

Dear Mr. Galipo,

Thank-you for retaining me to analyze and render opinions regarding the December 18, 2021, Officer-Involved Shooting incident at 908 E. Adams Boulevard, Los Angeles, California, 90011, that involved Los Angeles Police Department Police Officer II Julio Quintanilla, Serial No. 42454, Police Officer II Jose Zavala, Serial No. 40197, that resulted in the death of Mr. Margarito Lopez.  Pursuant to the requirements of Rule 26, I have studied reports, Body-Worn Camera video/audio-recordings, Los Angeles Police Department documents, Transcriptions of Digitally Recorded Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

## On-Scene Consulting

**<u>Materials Reviewed:</u>**

1. Complaint for Damages, <u>Case No. 2:22-cv-7534.</u>

2. Photographs, (<u>DEF 124-430</u>).

3. Los Angeles Police Department, Incident Recall, 12/18/21, <u>PD21121800002616</u>, (<u>DEF 1229-1268</u>).

4. Scene Diagrams, (<u>DEF 1279-1286</u>).

5. Statement of Police Officer II Alex Yim, (<u>DEF 1531-1577</u>).

6. Statement of Police Officer II Jose Jaime, (<u>DEF 1578-1621</u>).

7. Statement of Police Officer II Jesse Lopez, (<u>DEF 122-1654</u>).

8. Statement of Police Officer II Enrique Meraz, (<u>DEF 1655-1700</u>).

9. Statement of Police Officer II Brandon Prisk, (<u>DEF 1701-1725</u>).

10. Statement of Police Officer II Julio Quintanilla, (<u>DEF 1726-1780</u>).

11. Statement of Police Officer II Jose Zavala, (<u>DEF 1781-1837</u>).

12. Statement of Sergeant I Police Officer II Alex Yim, (<u>DEF 1531-1577</u>).

13. Statement of Police Officer II Jose Zavala, (<u>DEF 1781-1837</u>).

14. Statement of Sergeant I Christopher Burke, (<u>DEF 1884-1939</u>).

15. Los Angeles Police Department, Officer-Involved Shooting, Force Investigation Division, (<u>FID</u>), <u>FID No. 06-21</u>, (<u>DEF 2229-2256</u>).

16. Axon Body 3, <u>X6039BAH4</u>, (<u>DEF BURKE 2340</u>), (<u>21:55</u>).

17. Axon Body 3, <u>X6039BAH4</u>, (<u>DEF BURKE 2341</u>), (<u>2:47</u>).

On-Scene Consulting

18.  Axon Body 3, <u>X6039BAH4</u>, (<u>DEF BURKE 2342</u>), (<u>1:30</u>).

19.  Axon Body 3, <u>X6039BCHZ</u>, (<u>DEF BURKE 2343</u>), (<u>23:09</u>).

20.  Axon Body 3, <u>X6039B8IK</u>, (<u>DEF BURKE 2344</u>), (<u>18:20</u>).

21.  Axon Body 3, <u>X6039BBMY</u>, (<u>DEF BURKE 2345</u>), (<u>23:14</u>).

22.  Axon Body 3, <u>X6039BFGE</u>, (<u>DEF BURKE 2346</u>), (<u>24:44</u>).

23.  Axon Body 3, <u>X6039BAZF</u>, (<u>DEF BURKE 2347</u>), (<u>20:10</u>).

24.  Axon Body 3, <u>X6039BBV6</u>, (<u>DEF BURKE 2348</u>), (<u>23:14</u>).

25.  Axon Body 3, <u>X6039BBTS</u>, (<u>DEF BURKE 2345</u>), (<u>19:09</u>).

26.  Los Angeles Police Department Manual, (<u>On-Line</u>).

27. Deposition Transcript of Jose Jaime taken on September 20, 2023.

28.  Deposition Transcript of Christopher Burke taken on November 3, 2023.

29.  Deposition Transcript and Exhibits of Julio Quintanilla taken on July 27, 2023.

30.  Deposition Transcript and Exhibits of Jose Zavala taken on July 27, 2023.

**<u>California POST Basic Learning Domains as Follows:</u>**
1.  #1: "Leadership, Professionalism and Ethics."
2.  #2: "Criminal Justice System."
3.  #3: "Policing in the Community."
4.  #20: "Use of Force."
5.  #21: "Patrol Techniques."
6.  #23: "Crimes in Progress."
7.  #33: "Arrest and Control."
8.  #34: "First Aid, CPR, and AED."
9.  #35: "Firearms/Chemical Agents."
10. #37: "People with Disabilities."

On-Scene Consulting

## Summary

The following statement and summaries were used in part during my review but are in no way meant to be exhaustive. The documents listed in the <u>Materials Reviewed Section</u> of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

## Los Angeles Police Department, Officer-Involved Shooting, Force Investigation Division, (FID), FID No. 06-21, (DEF 2229-2256):

*On December 18, 2021, Los Angeles Police Department Officers Yim, Prisk, Zavala, Quintanilla, and Sergeant Burke responded to a call for a man with a knife at 908 East Adams Boulevard. Additional units followed.*

*"As Sergeant Burke, drove on Adams Boulevard, a male and female flagged him down and pointed to Margarito. As Sergeant Burke exited his police vehicle, Margarito was sitting on the exterior stairs of the apartment building located at 900 East Adams Boulevard, holding a knife in his right hand with the blade pressed against his neck. Sergeant Burke attempted to communicate with Margarito and gain his compliance with negative results. Sergeant Burke subsequently unholstered his service pistol. At 1702:05 hours, Officers Zavala and Quintanilla arrived at the scene taking cover behind their police vehicle's doors and unholstered their service pistols."*

*"While Officer Quintanilla was giving Margarito commands to drop the knife, Officer Zavala requested a backup on a "415 man with a knife." Officer Zavala also requested that a Rescue Ambulance, (RA) respond to stage at Adams Boulevard and Griffith Avenue."*

*"At 1702:22 hours, Officer Yim and Prisk arrived on scene. Sergeant Burke directed them to retrieve their 40mm Less Lethal-Launcher, (LLL). Officer Yim retrieved the 40mm LLL and took a position of cover behind the driver's side door of Sergeant Burke's police vehicle. According to Sergeant Burke's Body Worn Video, (BWV), at 1702:24 hours, Margarito held the knife in front of himself at shoulder level, repeatedly rotating the blade back and forth, from left to right. Sergeant Burke directed Officer Prisk to take cover behind the passenger side door of his (Sergeant Burke's) police vehicle. Sergeant Burke holstered his service pistol and assigned the role of lethal cover to Officers Quintanilla and Zavala, advising them of Officer Yim's role as the less-lethal cover."*

*"After a Code Four broadcast for an unrelated backup in Newton Division, Sergeant Burke advised CD that he was Code Six on the 415 man with a knife call and requested*

## On-Scene Consulting

*additional units to respond for traffic control. According to Officer Zavala's BWV at 1702:59 hours, Officer Zavala told Officer Quintanilla that he was going to talk to Margarito in Spanish. Officer Zavala then took over communications from Officer Quintanilla. At 1703:02 hours, Margarito placed the knife's blade against his left palm and again began making a cutting motion. Margarito then placed the blade against the side of his throat; multiple officers yelled, "Don't do it!" Sergeant Burke directed Officer Yim to deploy the 40mm LLL. Sergeant Burke abruptly told Officer Yim to "wait, hold on, hold on," as Officer J. Lopez, Serial No. 42696, Rampart Patrol Division, arrived in his police vehicle. Sergeant Burke directed Officer Lopez to join Officer Prisk and assigned them to be an arrest team."*

*"Margarito stood up holding the knife to his throat and gestured the sign of the crucifix across his chest with his left hand. Sergeant Burke directed Officer Yim to fire the 40mm LLL and announced, "Forty stand by!" At 1704:06 hours, Officer Yim discharged one 40mm round at Margarito from approximately 30 feet. The 40mm round struck Margarito in the abdomen area but did not appear to affect him. Margarito walked down the steps while holding the knife to his throat and took a seat at the bottom step."*

*"At 1704:35 hours, Sergeant Burke retrieved a ballistic shield from his police vehicle and assigned it to Officer Lopez if they needed to approach Margarito. Sergeant Burke yelled to Officers Quintanilla and Zavalla, "You still got lethal coverage right here." Sergeant Burke walked back to the driver's door of his vehicle and stood next to Officer Yim. For the next several minutes, Officer Zavala, Quintanilla, and Sergeant Burke alternated communicating with Margarito. At 1705:36 hours, officers can be heard warning that someone was coming out of the building, as a person attempted to walk out of the entry door of the apartment building. Sergeant Burke yelled the command, "Hey stay right there, do not come out. Additional officers can be heard warning the person to stay inside and move away from the windows."*

*"During the incident, Officers E. Meraz, Serial No. 41215, and J. Jaime, Serial No. 41161, Newton Area GED, arrived on the scene. Officer Meraz deployed the shotgun and positioned himself as a lethal cover officer alongside Officer Yim. Officer Jaime deployed the Beanbag shotgun and was ultimately directed by Sergeant Burke to move to the west side of the containment with Officer Zavala to provide less-lethal cover at that position. Sergeant Burke and Officer Zavala continued to alternate giving commands to Margarito. Sergeant Burke directed Officer Lopez to reposition his (Officer Lopez') police vehicle to the southeast corner of Adams Boulevard and Griffith Avenue to block pedestrian traffic."*

On-Scene Consulting

*"Sergeant Burke directed Officer Prisk to reposition his (Officer Prisk's) police vehicle between his (Sergeant Burke's) and Officer Zavala's police vehicles.  At 17:09:44 hours, Officers Prisk returned to his police vehicle and Sergeant Burke continued to use the PA system to communicate with Margarito.  As Officer Prisk parked his vehicle between Sergeant Burke and Officer Zavala's police vehicles, Margarito stood up holding the knife in front of himself at head level.  Margarito looked toward his family members gathered in their front yard approximately 35 feet east of his location in front of the apartment building.  Sergeant Burke announced, "Get ready!" as he simultaneously ran around the back of his police vehicle toward Officer Yim's position and announced, "Forty, forty up."*

*"At 1710:17 hours, Margarito was sitting on the bottom step with the knife positioned between his legs and his head down.  Suddenly, Margarito used his left hand to knock his hat off his head and stood up holding the knife in front of himself at head level.  At 1710:19 hours, Margarito took four steps forward in a northerly direction toward Officer Yim, then turned to his left in a westerly direction toward Officer Yim, then turned to his left in a westerly direction.  At that moment, Officer Yim announced, "Forty, standby," as Sergeant Burke him to fire the 40mm LLL.  Officer Yim fired one 40mm round at approximately 22 feet impacting the lower right side of Margarito's torso.  Approximately .382 seconds later, Officer Zavala discharged his first three rounds from his service pistol from approximately 25 feet striking Margarito.  Approximately .322 seconds after Officer Zavala discharged his third round, Officer Quintanilla discharged one round from his service pistol at Margarito from approximately 28 feet.  Margarito fell to the ground, onto his back, and the knife fell from his hand coming to rest on the sidewalk."*

*"Sergeant Burke broadcast a "shots fired, officer needs help" call and began organizing an arrest team assigning Officers Prisk and Quintanilla as the "hands-on" officers.  Officers approached Margarito, handcuffed him, and placed him in a recovery position.  Officer Quintanilla then directed Officer Prisk to retrieve a medical kit from his police vehicle.  Los Angeles Fire Department (LAFD) RA No. 1 arrived at scene and transported Margarito to Los Angeles County University of Southern California Medical Center."*

*"At 1809 hours, Margarito succumbed to was pronounced deceased."*

**Opinions:**

Note:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  I hold the opinions below a reasonable degree of professional

On-Scene Consulting

certainty.  The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my comprehensive materials listed on <u>Pages 2-3</u> of this report.  My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions.  My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

### <u>Opinion Number 1</u>

It is my opinion based on my review of the facts, videos and testimony in this matter, a reasonable Police Officer would have initially determined Mr. Margarito Lopez was mentally ill or experiencing a mental crisis.  It is my opinion Los Angeles Police Department Police Officer II Julio Quintanilla, <u>Serial No. 42454</u>, Police Officer II Jose Zavala, <u>Serial No. 40197</u>, <u>failed</u> to initially determine Mr. Margarito Lopez was mentally ill or experiencing a mental crisis.

Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Margarito Lopez who are suffering from a mental illness or experiencing a mental crisis.  The objective is to avoid unnecessary injury and or death.  The underlying principle is reverence for human life.  These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional resources and equipment; provide reassurance that the Police Officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions.  These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  <u>There was no rush</u>. Mr. Margarito Lopez did not threaten the Police Officers or any civilian in the area.  There was <u>no crime in progress</u> and there was no information that he committed a crime prior to the arrival of Sergeant Christopher Burke.

In addition, it is my opinion Sergeant Christopher Burke failed to request the Mental Evaluation Unit, (<u>MEU</u>) to respond to the scene as a resource to provide mental health

## On-Scene Consulting

history for Mr. Margarito Lopez or assist with the negotiations.  For more than four decades, the Los Angeles Police Department has deployed MEU to assist patrol officers with mental health-related calls.  With more than 160 personnel assigned to the MEU, the LAPD has one of the first and largest law enforcement mental health co-response operations in the nation.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 20-Chapter 2: Force Options, Communication, 2-11</u>: Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety.  <u>Effective communication can</u>:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to Sergeant Christopher Burke, he believes Mr. Margarito Lopez at the time could have been a "male mental," (<u>Deposition Transcript of Christopher Burke, Page 14</u>).
- According to Police Officer Alex Yim, he does not recall if he heard of any requests for the mental health team to arrive, (<u>Deposition Transcript of Alex Yim, Page 36</u>).
- According to Jose Zavala, he got the impression that Mr. Lopez might be suicidal, (<u>Deposition Transcript of Jose Zavala, Page 48</u>).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los

On-Scene Consulting

Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 2

It is my opinion that a reasonable Police Officer acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Margarito Lopez that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"  Based upon my review of the facts, testimony and videos in this matter, Los Angeles Police Department Police Officer II Julio Quintanilla, Serial No. 42454, did not give a verbal warning to Mr. Margarito Lopez and give Mr. Margarito Lopez a reasonable opportunity to comply prior to firing his Smith & Wesson Model M&P 9mm, semi-automatic pistol one time, even though it would have been feasible to do so.

In addition, it is my opinion Police Officer II Julio Quintanilla, Serial No. 42454, failed to comply with Los Angeles Police Department, Policy 556, Use of Force:

Verbal Warnings: Where feasible, a peace officer shall, prior to the use of any force, make reasonable efforts to identify themselves as a peace officer and to warn that force may be used, unless the officer has objectively reasonable grounds to believe that the person is aware of those facts.

In addition, I base my opinion on the following facts and testimony in this matter:

- According to Police Officer Jose Jaime, it is Department policy, that you must give a verbal warning when feasible, (Deposition Transcript of Jose Jaime, Page 42).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to

On-Scene Consulting

reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 3

It is my opinion that a reasonable Police Officer acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Margarito Lopez that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible…*"  Based upon my review of the facts, videos and testimony in this matter, it is my opinion Los Angeles Police Department Police Officer II Jose Zavala, Serial No. 40197, did not give a verbal warning, to Mr. Margarito Lopez and give Mr. Margarito Lopez a reasonable opportunity to comply, even though it would have been feasible to do so, prior to firing his Glock Model 17, 9mm, semi-automatic pistol, three times.

In addition, it is my opinion Police Officer II Jose Zavala, Serial No. 40197, failed to comply with Los Angeles Police Department, Policy 556, Use of Force:

Verbal Warnings: Where feasible, a peace officer shall, prior to the use of any force, make reasonable efforts to identify themselves as a peace officer and to warn that force may be used, unless the officer has objectively reasonable grounds to believe that the person is aware of those facts.

In addition, I base my opinion on the following facts and testimony in this matter:

On-Scene Consulting

- According to Police Officer Jose Jaime, it is Department policy, that you must give a verbal warning when feasible, (<u>Deposition Transcript of Jose Jaime, Page 42</u>).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## <u>Opinion Number 4</u>

It is my opinion that a reasonable Police Officer acting consistent with standard police practices would <u>not</u> have used lethal force in this situation. It is my opinion based on my review of the facts, videos and testimony in this matter, Mr. Margarito Lopez did not verbally threaten or physically threaten any Los Angeles Police Department Police Officers on 12/18/21, to include Los Angeles Police Department Police Officer II Julio Quintanilla, <u>Serial No. 42454</u>, when he fired his Smith & Wesson Model M&P 9mm, semi-automatic pistol one time, which resulted in the death of Mr. Margarito Lopez. In addition, Mr. Margarito Lopez was not advancing towards any Los Angeles Police Department Police Officers or civilians at the time Police Officer II Julio Quintanilla, fired his duty pistol.

## <u>Considerations Regarding the Use of Deadly Force</u>

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by ***the reverence for human life*** and used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome

On-Scene Consulting

responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an "*Objectively Reasonable"* standard.  The following quote from POST typifies the training (emphasis added):*"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."(Learning Domain #20; "Introduction to the Use of Force, " pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1.  The power of arrest and
2.  The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.*  This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves*.  These powers come to the criminal justice system from the people they serve.  (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon

On-Scene Consulting

"subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, it is my opinion that Los Angeles Police Department Police Officer II Julio Quintanilla, Serial No. 42454, violated failed to comply with Los Angeles Police Department, Policy 556, Use of Force:

Use of Force-Deadly: It is the policy of this Department that officers shall use deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of following reasons:
- To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or
- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

Note: Because the application of deadly force is limited to the above scenarios, an officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or another person.

In addition, I base my opinion on the following facts and testimony in this matter:
- *"Regarding Officer Quintanilla, the Board was again critical of the perceived threat posed by Margarito and opined that the investigation did not support his assertion of an imminent deadly threat.  Although Officer Quintanilla may have*

On-Scene Consulting

*feared for his life, his partner's life, and the lives of the citizens, they believed his fear was also predicated on the likelihood of future harm, not an imminent deadly threat.  Based on the BWV footage, the Board opined that Margarito did not have the apparent intent to harm Officer Quintanilla when the OIS occurred.  While the Board considered Officer Quintanilla's statements regarding the imminent threat Margarito posed to his family and pedestrians, the Board opined that he did not have the apparent intent or the opportunity to harm them as officers were controlling pedestrian traffic and Margarito's family was east of his location.  Based on the totality of the circumstances, the Board opined Officer Quintanilla's use of lethal force was not objectively reasonable, proportional, or necessary."*

- According to Police Officer Jose Jaime, he does not recall hearing Mr. Margarito Lopez yell or threaten the officers, (<u>Deposition Transcript of Jose Jaime, Page 39</u>).
- According to Sergeant Christopher Burke, he never heard Mr. Margarito Lopez threaten anyone, (<u>Deposition Transcript of Christopher Burke, Page 13</u>).
- According to Police Officer Julio Quintanilla, after the shooting, he was suspended for (<u>5</u>) days, received retraining and was out of the field for (<u>8</u>) months as a result of this incident, (<u>Deposition Transcript of Julio Quintanilla, Page 72</u>).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## <u>Opinion Number 5</u>

It is my opinion that a reasonable Police Officer acting consistent with standard police practices would <u>not</u> have used lethal force in this situation. It is my opinion based on my review of the facts, videos and testimony in this matter, Mr. Margarito Lopez did not verbally threaten or physically threaten any Los Angeles Police Department Police

## On-Scene Consulting

Officers on 12/18/21, to include Los Angeles Police Department Police Officer II Jose Zavala, <u>Serial No. 40197,</u> prior to firing his Glock Model 17, 9mm, semi-automatic pistol, three times, which resulted in the death of Mr. Margarito Lopez. In addition, Mr. Margarito Lopez was not advancing towards any Los Angeles Police Department Police Officers or civilians at the time Police Officer II Jose Zavala.


## **<u>Considerations Regarding the Use of Deadly Force</u>**

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by ***the reverence for human life*** and used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an "*Objectively Reasonable"* standard.  The following quote from POST typifies the training (emphasis added):*"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."*(Learning Domain #20; "<u>Introduction to the Use of Force,</u> " pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1.  The power of arrest and
2.  The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.*  This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer "police powers" on themselves*.  These powers come to the criminal justice system from the

On-Scene Consulting

people they serve.  (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).
The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, it is my opinion that Los Angeles Police Department Police Officer II Julio Quintanilla, Serial No. 42454, violated failed to comply with Los Angeles Police Department, Policy 556, Use of Force:

Use of Force-Deadly: It is the policy of this Department that officers shall use deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of following reasons:
- To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or

## On-Scene Consulting

- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

<u>Note</u>: Because the application of deadly force is limited to the above scenarios, an officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or another person.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:

- *"While the Board considered Officer Zavala's perception, they noted that the investigation did not support his belief of the imminent threat posed by Margarito. Although Officer Zavala may have feared for his life, his partner's life, and the lives of the citizens, the Board opined that his fear was predicated on the likelihood of future harm, not an imminent deadly threat. Based on the BWV footage, the Board opined that Margarito did not have the apparent intent to harm Officer Zavala when the OIS occurred. The Board also opined that he did not have the apparent intent to harm the citizens as officers were controlling pedestrian traffic. Based on the totality of the circumstances, the Board opined that Officer Zavala's use of lethal force, all three rounds, was not objectively reasonable, proportional, or necessary."*
- According to Police Officer Jose Jaime, he does not recall hearing Mr. Margarito Lopez yell or threaten the officers, (<u>Deposition Transcript of Jose Jaime, Page 39</u>).
- According to Sergeant Christopher Burke, he never heard Mr. Margarito Lopez threaten anyone, (<u>Deposition Transcript of Christopher Burke, Page 13</u>).
- According to Jose Zavala, he never heard Mr. Margarito Lopez threaten to harm any of the officers, (<u>Deposition Transcript of Jose Zavala, Page 14</u>).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised

On-Scene Consulting

hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 6

It is my opinion Los Angeles Police Department Police Officer II Julio Quintanilla, <u>Serial No. 42454</u>, Police Officer II Jose Zavala, <u>Serial No. 40197</u>, use of lethal force violated Peace Officer Standards and Training and caused the unnecessary death of Mr. Margarito Lopez but not limited to for the following reasons:

- Police are trained that deadly force is the highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Police Officers are trained that deadly force can only be used as a last resort.
- Police Officers are trained that deadly force can only be used in the direst of circumstances.
- Police Officers are trained that deadly force is likely to cause great bodily injury or death.
- Police Officers are trained that they must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- A verbal warning should be given, when feasible, that deadly force will be used. Here, no warning was given, even though it would have been feasible to do so.
- Police Officers are trained that they are responsible for justifying every shot.
- Subjective Fear is insufficient to justify using deadly force.
- Police Officers are trained that an overreaction in using deadly force is excessive force.

I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### My Qualifications for Reviewing this Case:

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in

## On-Scene Consulting

Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale drug smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I was assigned to a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer (FTO) at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident.

I was promoted to the rank of Detective and attended the LAPD Detective School.  Upon completion of LAPD Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended the mandated LAPD Supervisor School.  In conjunction with LAPD Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily

## On-Scene Consulting

basis on numerous subject matters to include Use of Force Options (<u>Non-Lethal and Lethal</u>), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised Police Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (<u>Ratings/Evaluations</u>), Use of Force Investigations, Administrative Projects, and prepared commendations for Police Officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group, (<u>SEG</u>).  I directly supervised (<u>14</u>) Police Officers and Detectives assigned to the Unit.  SEG worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in Hollenbeck Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal force, lethal force and search warrant tactics training to Police Officers and Detectives.  SEG prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the search warrant service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was assigned to Internal Affairs Division (<u>IAD</u>), Headquarters Section.  I investigated personnel complaints that exceeded the scope for a geographical Division.  At the conclusion of my assignment to IAD, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I conducted research and edited the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I was selected as a Sergeant II at 77th Division Vice.  I directly supervised (<u>10</u>) undercover Vice Officers and four uniformed Police Officers.  I provided all facets of training to the Police Officers assigned to Vice to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations Training, Surveillance Training, and any other training deemed necessary by the Area Commanding Officer.  I conducted audits,

On-Scene Consulting

personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits and Internal Affairs Audits on Specialized Units in Central Bureau and South Bureau.

In 2000, I was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (16) K9 Handlers.  Metropolitan Division K9 conducted K9 searches for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Sergeant School, Field Training Officer (FTO) School and Detective School.   While assigned to K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, and Use of Force Investigations.  In addition, I directed and was directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised (60) SWAT Officers.  I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, 37mm, X-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team, (CNT).  I provided on-going Crisis Negotiation Training, mental health training, Tactical de-briefs of SWAT incidents, 40-hour POST Certified CNT School, and suicide prevention training.  I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and Didi Hirsch Suicide Prevention Training.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

On-Scene Consulting

During this time, I was selected as the LAPD SWAT representative to respond to Mumbai India with LAPD Counterterrorism and Las Vegas Metropolitan Division Police Department Counterterrorism following the terrorist attack in November 2008.  I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of Multi-Assault, Counter-Terrorism Action Capabilities, (MACTAC).

In June 2010, I retired from the Los Angeles Police Department with over 20 years of service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included identifying and conducting Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  I utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  I identified and monitored potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated.  I mitigated expected threats.  I utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  I responded to hostilities.  I identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies.  I conducted all facets of security training for the company and employees.  I formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  I conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC).  I processed and monitored inmate population from initial intake, housing, court, transportation, and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I utilized my experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. I provided information to Gang Detail. I functioned as a mentor

## On-Scene Consulting

to newly appointed Deputy Sheriffs as well as Supervisors. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza.  I conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  I ensured all Security Professionals were compliant with BSIS security training and licensing.  I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  I conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED) and protocols to respond and mitigate threats.  I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events.  I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 2017, I was the Director of Security at L&R Group of Companies.  I conducted Risk and Vulnerability (RAV) Assessments for all L&R Group of Companies developments and projected developments throughout the United States. I conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  I ensured all Security Professionals were compliant with BSIS security training and licensing.  I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.  I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.  I coordinated all security efforts to ensure safety at Special Events.  I conducted internal investigations and worked

On-Scene Consulting

in conjunction with the Los Angeles Police Department (<u>LAPD</u>) and the Los Angeles
Fire Department (<u>LAFD</u>) on an ongoing basis as well as respective law enforcement
agencies throughout the United States on security matters.

In 2020, I received my Master of Legal Studies from Pepperdine Caruso School of Law.

Attached are my curriculum vitae, listing of testimony and fee schedule.

<u>Scott A. DeFoe</u>