# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARGARITO T. LOPEZ, SONIA TORRES,    )
     KENI LOPEZ, ROSY LOPEZ,              )
 5                                        )
                 Plaintiffs,              )
 6                                        )
                 vs.                      )Case No.
 7                                        )2:22-CV-07534-FLA-MAA
     CITY OF LOS ANGELES, JOSE ZAVALA,    )
 8   JULIO QUNITANILLA, and DOES 1 through)
     10, inclusive,                       )
 9                                        )
                 Defendants.              )
10   _____)

11

12

13

14         REMOTE VIDEOCONFERENCE DEPOSITION OF

15                   CHRISTOPHER BURKE

16              FRIDAY, NOVEMBER 3, 2023

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:   26560
```

1    A.   No, I did not.
2    Q.   Do you have an estimate as to his age just based on
3  your observations?
4    A.   When I looked at him I could tell he -- I believe
5  him to be approximately 20-years old.
6    Q.   And when you saw him standing up at the time of the
7  40 deployment initially, did you have a sense of his height
8  or weight?
9    A.   He was -- he's approximately I thought anywhere from
10 five-feet to five-feet five inches, and you know 100 to 120
11 pounds.
12   Q.   Fairly small in stature; is that a fair statement?
13   A.   Sure.
14   Q.   Did you think when you saw him making the sign of
15 the cross or putting the knife to his neck, that he might be
16 experiencing some type of a mental health crisis?
17   A.   I believed that at the time that he could possibly
18 be under the influence of some type of unknown uncontrolled
19 substance or that he possibly could be a male mental.
20   Q.   Do you know if there was anything communicated over
21 the radio in the early part of the call about he might have a
22 mental illness or words to that effect?
23   A.   I do not recall any chatter on the radio about
24 that.
25   Q.   At some point you saw him get up or start to get up

1  from the bottom of the steps; is that correct?

2      A.   There was a point that when he -- he did attempted
3  to stand get to his feet, yes, at the bottom of the steps.

4      Q.   Where were you positioned at that time?

5      A.   Initially, we -- well, if I can go back.

6           Initially before he stood up that last time, based
7  on my recollection, I do recall I believe he made a sign of a
8  cross again.  He knocked his hat off.  He was wearing a
9  baseball cap.  He knocked his baseball cap off with his left
10 hand.  At that point from what I recall, he was about to
11 stand up or he may have just stood up.

12          I ran around to the backside of my vehicle in an
13 attempt to get over to where I placed the 40-millimeter
14 less-lethal launcher which was on the driver side of the
15 vehicle.

16     Q.   Okay.

17          MR. GALIPO:  Shannon, can we show the witness
18 Exhibit 1, the diagram that we had used in the prior
19 deposition.

20          MS. LEAP:  Yeah.  One moment.

21          (Exhibit 1 was marked for identification.)

22 BY MR. GALIPO:

23     Q.   We're going to look at a diagram.

24          And can we just enlarge the area of the cars a
25 little bit.

1   A.   The reason -- the reason I ran around the rear of
2   the vehicle is based on the observations that I observed of
3   him making the sign of the cross knocking the hat off and
4   attempting to stand up or standing up rather rapidly, I
5   believed -- I believed he was going to run over to his family
6   with the meat cleaver in hand.
7        And the reason why I believed that was because I
8   know we had containment set up to the north; we had
9   containment set up to the west; we had an opening on the
10  east; and I just believed that he was going to run over to
11  the family and possibly cause them harm with that meat
12  cleaver.
13       So I wanted to direct Officer Yim to fire another
14  40-millimeter at Mr. Lopez to stop that from occurring.
15  **Q.   Okay.  Would the east as we look at this diagram,**
16  **would the east be to the right?**
17  A.   Yes.  The east would be to the right where his
18  family was located.  The west would be left.  The north would
19  be top, and the south would be bottom of the page.
20  **Q.   And how long do you think, approximately, you had**
21  **been observing Mr. Lopez in total before that last time he**
22  **got up or started to get up?**
23  A.   Are you asking me, sir, from the time that I arrived
24  at scene, the total the last time that he stood up; is that
25  what you're asking me?

```
 1                          CERTIFICATE

 2                              OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 3, 2023.

23                              [signature]

24                         _____
                           Jinna Grace Kim, CSR No. 14151
25
```